# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| FRANK'S CASING CREW AND RENTAL TOOLS, INC., AND FRANK'S INTERNATIONAL, INC., <br> Plaintiffs, <br><br> v. <br><br> TESCO CORPORATION, AND TESCO CORPORATION (US), <br> Defendants. <br><br> & <br><br> ROBERT APPLETON, <br> Consolidated Plaintiff, <br><br> v. <br><br> FRANK'S CASING CREW AND RENTAL TOOLS, INC., AND FRANK'S INTERNATIONAL, INC., <br> Defendants. | § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 2-07-CV-015 (TJW) |

## **MEMORANDUM OPINION AND ORDER**

After considering the submissions and the arguments of counsel, the Court issues the following order concerning the claim construction issues:

**I.     Introduction**

Plaintiffs Frank's Casing Crew and Rental Tools, Inc., and Frank's International, Inc. (collectively "Frank's") allege Defendant Tesco Corporation ("Tesco") infringes claims 1, 2, 4, 6-10, 15, and 17-23 of U.S. Patent No. 6,309,002 ("the '002 patent"). Robert Appleton sought to intervene in this case asserting he was the true inventor of the inventions disclosed in the '002 patent and U.S. Patent No. 6,431,626 ("the '626 patent"). Appleton then filed a separate suit claiming to

be the true inventor of the two patents. On August 22, 2008, the court consolidated the two cases. Because of the similarity of the specifications, terms, and scope of these two asserted patents, as well as their common lineage, the claim terms in the '626 Patent should be construed consistently with the corresponding terms in the '002 Patent. With the exception of two terms, Appleton adopts and endorses Frank's proposed claim constructions.

## II. Background of the Technology

The '002 patent describes a tool that is used to run tubular goods into a wellbore during oil and gas drilling operations. Individual joints or sections of tubulars, such as drill pipe or casing, must be screwed together to form a "string" that is inserted or "run" into the wellbore. This process of "running" tubular goods involves many operations and tools such as large traveling elevators, power tongs, and an elevated work platform or scaffolding at the rig floor. Typically, it is necessary to cement into place casing that has been run into the wellbore. The '002 patent is directed to combining most of the prior art functions into one tool for running tubulars into and out of a wellbore. The '626 patent also describes a tool used to run tubular goods, but has some improvements and additional features over the '002 patent.

## III. General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id*. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id*. "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (*quoting Innova/Pure Water, Inc. v. Safari Water*

*Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id*. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. The patent is addressed to and intended to be read by others skilled in the particular art. *Id*.

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315 (*quoting Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id*. at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

4

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id*. Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id*. at 1319-24. The approach suggested by *Texas Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id*. at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.* What is described in the claims flows from

the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id*. The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id*. at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant. The court now turns to a discussion of the disputed claim terms.

## IV. Terms in Dispute

### A. Agreed Constructions

The parties have stipulated to the construction of the following terms in the claims:

"Tubular member/string" and "tubular member" means "single or assembled multiple joints of casing or other tubulars."

"Selectively internally gripping" means "choosing to grip and release the inside wall of the tubular member."

"Selectively engaging an interior portion of a tubular member" means "choosing to move the slips into and out of engagement with the inside wall of a tubular member."

"Slip" means "gripping element."

"A barrel forming an axial fluid pathway therethrough" means "a generally cylindrical

6

member formed of one or more hollow sections for the passage of liquid or gas in a axial direction."

B. **Disputed Constructions**

1. **"tubular running tool"**

Frank's proposes this term means "a tool to lift, lower, rotate, and torque tubulars together or apart." Appleton and Tesco propose that this term does not need construction because the term is defined by the "comprising" language of each independent claim. Tesco, however, maintains if the court decides to construe the claim, Frank's construction is incorrect because the tool need not rotate. The term only exists in the claims' preambles and is not needed for antecedent basis.

The parties' main dispute is over whether this term should be construed. Tesco maintains that "tubular running tool" is merely the invention's title or name and not an element of the claims at issue. Tesco further argues that the term does not "breath life into the claims," which is a requisite for construing terms in the preamble if not needed for antecedent basis.

"[A] preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Poly America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1309-10 (Fed.Cir. 2004). Frank's argues that the claims should be limited by the preamble term "tubular running tool" because the patent specification repeatedly refers to the invention as a "tubular running tool," and Frank's intention was to distinguish the invention from the prior art by insisting the invention was "a tubular running tool."

During prosecution, the examiner cited U.S. Pat. No. 3,265,431 ("the *Guess* patent") as substantially showing the same invention as the one claimed in the '002 patent. In Frank's October 11, 2000 Amendment After First Office Action, Frank's argued that the *Guess* patent only discloses a "spear" stating that "[t]he present invention is a tubular running tool and not a spear." (Ex. 12,

7

FCC001086, Ex. 14 U.S. Pat. No. 3,265,431). Specifically, the applicant argued "[t]he operation of [a] spear is to let the spear down to a point below the casing to be removed and then jerking the spear upwards to cause the slips to spread out and drive the four tripping members into contact with the casing . . . The present invention allows the internal gripping of tubulars and pumping of fluid into the tubulars as a tubular string is being lowered down-hole." (Ex. 12 FCC001100).

The preamble is not usually limiting, especially "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." However, "*clear reliance* on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention." *Symantec Corp. v. Computer Associates Int'l, Inc.*, 522 F.3d 1279, 1288 (Fed.Cir. 2008) (emphasis added) (internal citations omitted). The examiner cited the *Guess* patent as substantially showing the same invention as the one claimed in the '002 patent. Indeed, the specification in *Guess,* as cited by the examiner, disclosed "a gripping tool comprising a barrel (10) with an axial fluid pathway (23) and a tapered section (24) having planar surfaces (43), a plurality of slips (40) having gripping members . . ." (Ex. 12 FCC001087). The examiner, however, rejected the applicant's argument that the invention was different from *Guess* because it was a "tubular running tool" and not a "spear." (Ex. 12. FCC001112) The examiner pointed out that the "Guess tool is deemed capable of 'inserting and selectively, internally gripping a tubular member/string" as broadly as recited in the independent [claim] . . ." *Id.* Frank's argues that it does not matter that the examiner did not ultimately agree; the invention is still so limited because it shows how the inventor understood the patent. The Federal Circuit has made clear, however, that the prosecution history evidences what both the patentee *and*

examiner saw as the invention. *Phillips,* 415 F.3d at 1317.

The claim matured into an allowed claim because the applicant added elements to the claim, not from the applicants attempt to distinguish "tubular running tool" from a spear. The applicant amended the claims to include the limitations of dependant claim 5. The applicant explained that "[b]ecause applicant has included the limitations of Claim 5 in the independent claims, Applicant believes the claims as amended and all claims depending therefrom are patentably distinct over Guess . . ." (Ex. 12, FCC001099). The examiner relied on the constituent elements of the claim to reject the applicant's argument that the invention was not a spear. The examiner was not persuaded that the preamble term limited the claim, and Frank's has not shown "clear reliance," as required under *Symantec*, to distinguish the invention from the prior art. The examiner looked to the elements of the claim to define "tubular running tool." Indeed, the applicant overcame the rejection by adding additional elements to the claim. Further, Tesco argues, and the court agrees, that removing the term "tubular running" all together from the preamble does not change what the claim defines. The term "tubular running tool," therefore, will not be construed as it does not breath life into the claim. The term is only the patentee's attempt to define "a structurally complete invention" or show the "intended use for the invention" in the claim body. *See Poly America,* 383 F.3d 1309-10.

### 2. "Drilling Rig Assembly"

Frank's proposed construction is "a top drive drilling rig." Tesco and Appleton propose the term means "the derrick or mast, drawworks, and attendant surface equipment of a drilling unit." This term appears only in the preamble of all claims; however, both parties agree the term needs to be construed. Frank's argues Tesco's construction is so generic it is meaningless, while Tesco argues that the specification shows the inventor's intent that more than just a "top drive" rig

9

assembly can be used. "General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989-90 (Fed. Cir. 1999). One of ordinary skill in the art would have understood what a "drilling rig" was at the time of the invention. "Drilling rig" by itself, therefore, needs no construction. *See Philips*, 415 F.3d at 1315.

Frank's argues that the restriction is proper because the tool needs to rotate and conventional rotary rigs do not provide that function. The specification, however, does not support that the "drilling rig assembly" is limited to "top drive" assemblies. There are several instances in the specification where the inventor makes clear that the "tubular running tool" is adapted for use on a conventional rotary *or* top drive drilling rig. (Abstract; 7:5, 8-9; 5:24-28, 42-44; 6:39-43). The background makes clear the inventor's intention was that the tool can, but does not have to, rotate tubulars. The specification anticipates an embodiment that includes an elevator attached to a conventional rig with no possibility of rotation. [2:51-65; Figs. 2, 3]. Indeed, there is no support in the specification for Frank's proposition that the drilling rig assembly must be a top drive. "Drilling rig assembly," therefore, means "a top drive or conventional rotary drilling rig."

### 3. "Said barrel forming a lower outwardly tapered section"

Frank's proposed construction is "said generally cylindrical member having a section tapered or inclined outwardly toward the bottom end of the barrel." Tesco proposes the term should be construed as "the outer radius of the barrel cylinder increases in length as the radius descends the barrel centerline and does so over a distinct expanse of the barrel, substantially forming a cone on the lower portion of the barrel."

Tesco argues Frank's proposal is too generic and merely restates the claim language. Tesco

argues "section" should be defined as to restrict the section to the "lower portion." The claimed barrel has "a top end and a bottom end, said barrel forming a lower outwardly tapered section." "Lower" is a term describing the location of the tapered section with respect to the top and bottom ends of the barrel. Tesco argues that "forming" needs construction in one instance, however, it uses the word "forming" in its own proposed construction. "Forming" need not be construed beyond its ordinary meaning.

The specification says the "tapered section may be conical or substantially conical in form." [3:29-31] The claim does not require the tapered section to be conical or substantially conical. Tesco's proposed construction is an attempt to limit the invention to the preferred embodiment. Tesco argues "tapered" ordinarily means "becoming continuously narrower or more slender in one direction," and "outwardly" reverses the direction, changing narrower to broader. Frank's does not offer any other construction of "tapered."

The term, therefore, is construed as "said generally cylindrical member having a section that becomes broader or is inclined outwardly toward the lower portion of the barrel."

4.     **"At Least One Slip Moveably Connected to Said Tapered Section"**

Frank's proposes the term means "at least one slip movably connected to said tapered section" should be construed as "at least one gripping element movably connected to the tapered section." Tesco proposes "at least one slip is attached to the tapered section of the barrel through a moveable fastener so that the slip can move axially and radially relative to the barrel while maintaining contact with the tapered section of the barrel."

Tesco argues that the movable connection must be some fastener. Its basis for this argument is that the only description in the specification of slips being "movably connected" to the barrel's

11

tapered section is a pin extending from the slips into a slot running along the tapered section. Figs 3-6; 3:32-46; 7:31-32; 8:6-10. This description, however, is only of the preferred embodiment. Tesco's proposed construction is an attempt to limit the claims to the preferred embodiment. Tesco further argues that, unlike inventions that relate to chemicals or DNA where "connecting" does not necessarily have to be some direct attachment, when the invention relates to mechanical parts "connected to" must be a direct attachment. This does not comport with current Federal Circuit precedent. Only where the context of the claim or prosecution history has precluded the possibility of indirect connections has the Federal Circuit narrowed the construction of "connected" to require a direct connection. *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1578 (Fed. Cir. 1996). There is nothing in the prosecution history or specification that requires actual contact.

Neither the specification nor prosecution history supports that "movably connected" must be directly connected. The term "connected" has its plain and ordinary meaning. While the specification discloses an embodiment that includes a pin inserted into a slot, the invention is not limited to that embodiment. "Movably" is also given its plain meaning. The parties have not offered competing definitions of "movable." The term "movably connected," therefore, means "a connection between two bodies allowing the bodies to change positions relative to one another."

      5.      **"Substantially Planar Section for Movably Connecting Said Slip"; and "One Substantially Planar Section, Each Said Section Having at Least One Slip Movably Connected Thereto"**

Frank's proposes that the term should be construed as "having a barrel section that is sufficiently flat to provide a stable surface for movably connecting at least one [the] slip to the tapered section for rotating said tubular member." Tesco proposes "a distinct part of each tapered

section that has a mainly flat two-dimensional quality is attached to at least one [the] slip through a movable fastener so that the at least one [the] slip can move axially and radially relative to the barrel while maintaining contact with the tapered section of the barrel." Because the court has construed "moveably connected" above, the only term to be construed is "substantially planar section."

The specification provides:

> It is also preferable that slip section 78 have planar section(s) 80 so as to form a substantially faceted slip section 78. Planar sections 80 provide a stable surface so that when slips 62 are moved into engaging contact with the interior surface of tubular 30, tool 14 may be rotated, such as in the top drive configuration, reducing the tendency of slips 62 from moving within tubular 30 thus reducing the damage to tubular 30 by scarring and also increasing the ability to apply torque to make-up or break joints of tubulars 30. Further, the tapered and planar configuration of slip section 78 makes tool 14 very adaptable to tubulars 30 of varying wall thickness without having to change slips 62 and or gripping elements 63 . . . Having a tapered section 64 with planar sections 80 increases the ability of tool 14 for internally gripping tubulars 30 of varying inside diameters. FIG. 5 is a partial cross-sectional, view of internal tubular gripping tool 14 of the present invention in conjunction with a fill-up and circulating tool 88.

[8:29-42, 51-53]

The specification makes clear that the "planar section(s) 80 . . . form a substantially faceted slip section 78." [8:29-32] The specification shows that the inventor understood the planar sections as a way to provide stability when the slips were engaging with the casing. While the specification describes a use for the planar section, the term construction does not require inclusion of that use. The claim only requires that the tapered section have a "substantially planar section." The term "substantially planar", therefore, is given its ordinary meaning: "substantially flat."

**6.     "A Moving Mechanism Functionally Connected Between Said Slips, Said Upper Sleeve and Said Lower Sleeve for Moving Said Slips in Engaging**

**Contact with and from Said Tubular Member"**

The parties' central dispute is whether "moving mechanism" is sufficiently structural to avoid 35 U.S.C. § 112 ¶ 6. Because the word "means" is not found in the claim, there is a presumption that § 112 ¶ 6 does not apply. *Lighting World v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004). The presumption, however, is rebuttable. The "generic terms 'mechanism,' 'means,' 'element,' and 'device,' typically do not connote sufficiently definite structure" to avoid § 112 ¶ 6. *Massachusetts Institute of Technology and Electronics for Imaging, Inc. v. Abacus Software,* 462 F.3d 1344, 1354 (Fed. Cir. 2006). Sometimes § 112 ¶ 6 can be avoided if the generic term is further defined in the claim language. *See id.* For example, the Federal Circuit found that "detent mechanism" provided sufficient structure to avoid § 112 ¶ 6. *Greenberg v. Ethicon Endo-Surgery, Inc*. 91 F.3d 1583 (Fed.Cir. 1996). The definition of "detent" was well understood in the art, and that definition "connoted sufficient structure to avoid § 112 ¶ 6." *Id.* In *MIT*, however, the Federal Circuit held that "colorant section" as a modifier to "mechanism" did not provide sufficient structure to a term because "colorant section . . . has no dictionary definition, and there is no suggestion that it has a generally understood meaning in the art." *MIT*, 462 F.3d at 1354.

Unlike "detent" which is a well understood definition in its relevant art, "moving" adds nothing to "mechanism" to provide structure. In this case, "mechanism" is synonymous with "means" such that "moving mechanism" means nothing different than "moving means." This term, therefore, should be construed under § 112 ¶ 6.

Frank's proposes the corresponding structure is "a pneumatic or hydraulic cylinder or other well known moving assembly that is joined directly or indirectly to the upper and lower sleeves and the slips." Tesco proposes "sleeves/collars, rings, pivot arms, multiple pistons, bolts/pins, and slots."

The specification clearly provides the structure for "moving mechanism." The specification says "[t]his mechanism may be a pneumatic or hydraulic cylinder including a piston or rod, or other well known moving assemblies." [3:58-60] As such, the corresponding structure is "a pneumatic or hydraulic cylinder including a piston or rod" and their equivalents. "Other well known moving assemblies," is not defined in the specification such that it is sufficiently structural.

### 7. "An Upper [or Lower] Sleeve Movably Disposed About an Upper [or Lower] Section of Said Barrel"

The parties' central dispute concerning this term is in which direction must the sleeve move. Frank's proposed construction is "a tubular part mounted around the upper section of said barrel and capable of changing position from one position to another on the barrel." Tesco proposes, "the upper sleeve moves axially and is fixed rotationally with respect to the barrel." The claim recites "movably disposed" without limitation on direction of movement. There is no support for Tesco's proposal in the specification or prosecution history. Frank's proposal is consistent with the plain and ordinary meaning of the term in light of the patent as a whole. The term, therefore, means "a tubular part mounted around the upper section of said barrel and capable of changing position from one position to another on the barrel."

### 8. "Fill-Up and Circulating Tool"

Frank's offers alternate proposals for this term. First, Frank's proposes "a tool capable of filling tubulars with fluid and circulating fluid through tubulars." Alternatively, Frank's suggests "a tool capable of filling and circulating fluid through tubulars." Tesco proposes "a tool used to both fill a casing joint with a fluid as the casing joint is being connected to the casing string and to pump

15

a fluid down the interior of the casing, out the bottom of the casing, and back up the hole through the annulus between the casing and wellbore." Absolutely nothing in the specification or prosecution history supports the limitations Tesco seeks to introduce in the claim by their proposed construction. Tesco also argues that Frank's proposal is deficient in that it fails to construe "circulating." Frank's does not dispute that the path should be added.

The specification provides that "[w]hen casing is run into the hole it is sometimes necessary to circulate fluid. Circulating fluid requires pumping a fluid down the interior of the casing, out the bottom of the casing and back up the hole through the annulus between the casing and wellbore." [1:66-2:3] The term, therefore, should be construed as "a tool capable of filling tubulars and capable of pumping a fluid down the interior of the casing, out the bottom of the casing and back up the hole through the annulus between the casing and wellbore."

### 9. "Cementing Head Assembly"

Both parties want this term construed. Frank's proposes "an accessory to facilitate the cementing of casing into a wellbore." Tesco proposes "an integrated device to facilitate the cementing of casing into a wellbore having a backpressure valve and a tee connection for inserting a ball."

Tesco points out that the specification refers to "cementing head" and "cementing head or ball drop assembl[ies]," but never "cementing head assemblies." Tesco, therefore, argues that "cementing head assembly" should be limited to the "cementing head assembly" incorporated by reference via U.S. Patent No. 5,735,348 ("the '348 Patent"). The "cementing head assembly" in the '348 patent includes a Kelly valve and "further includes a ball dropping pump-in tee 49 connected to the outlet of the Kelly valve 48." [the '348 Patent, 10:1-2; 14-16]. The specification of the '002

16

patent, however, makes clear that the cementing apparatus is not limited to the one described in the '348 patent. [9:20-25].

The specification provides that "cementing head may be connected to a fluid source for operation by such elements as a Kelly valve, and/or directly through top drive unit 12, and a connector which are all known in the art, or fluid source 20 or 24 may be connected to tubular 30, via tool 14 . . ." [10:39-43]. Here, Tesco attempts to limit the term to the preferred embodiment when the inventor made clear that the cementing apparatus is not limited to that embodiment. The patent as a whole evidences the inventor intended "cementing head assembly" as a device that can be integrated with the tubular running tool, as an optional accessory, that is used to cement tubulars in the wellbore. Frank's proposal, therefore, prevails.

### 10. "Wiper Plug Assembly"

Both parties agree this term needs to be construed. Frank's proposes "at least one wiper plug used to separate cement from another fluid for cementing operations." Tesco proposes "a detachable top device and at least one additional detachable device assembled to the separate cement from drilling fluid as they are being pumped down the inside of the casing during cementing operations." Tesco argues that Frank's proposal is lacking because it does not construe the technical term "wiper plug."

Tesco cites to an extrinsic source for the definition of "wiper plug." That definition is "a rubber-bodied, plastic- or aluminum-cored device used to separate cement and drilling fluid as they are being pumped down the inside of the casing during cementing operations. A wiper plug also removes drilling mud that adheres to the inside of the casing." PETEX, A DICTIONARY FOR THE OIL AND GAS INDUSTRY 302 (1st ed. 2005) ("wiper plug"). Frank's offers a competing extrinsic source:

17

"a hard rubber cylinder that is pumped down the casing string during a cement job. The wiper plug is used to separate the cement slurry from the fluids in front of and back of it and to prevent cement contamination . . ." DICTIONARY OF PETROLEUM EXPLORATION, DRILLING & PRODUCTION, 574 ("wiper plug").

The specification does not support Tesco's narrowing of the claim scope. The Hawkins Patent (U.S. Patent No. 5,735,348), incorporated by reference, refers to separating cement from "spacer fluid" or from "some other suitable fluid." There is no support for limiting the wiper plug to only being able to separate cement from drilling fluid in light of the specification and competing extrinsic sources. The patent as a whole evidences the inventor's intention that the "wiper plug assembly," like the "cementing head assembly" above, to be a device that can be integrated with the tubular running tool as an optional accessory. The term, therefore, should be construed as "an accessory to facilitate separating fluids from cement."

## V.    Conclusion

The Court adopts the constructions set forth in this opinion for the disputed terms of the '002, and '626 patents. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

SIGNED this 12th day of November, 2008.

                                                                                              */s/ T. John Ward*
                                            T. JOHN WARD
                                            UNITED STATES DISTRICT JUDGE